TONI L. DECKER, Special Adm'r of the Estate of Richard Decker, Deceased, Plaintiff-Appellee, v. ST. MARY'S HOSPITAL, Defendant-Appellant.

Fifth District No. 5—91—0170

Opinion filed August 31, 1993.

804

Carl W. Lee and Thomas R. Peters, both of Gundlach, Lee, Eggmann, Boyle & Roessler, of Belleville, for appellant.

Amiel Cueto and Thomas M. Daley, both of Cueto, Cueto & Cueto, Ltd., of Belleville, for appellee.

JUSTICE RARICK delivered the opinion of the court:

Plaintiff, Toni Decker, special administrator of the estate of Richard Decker, filed a nine-count complaint in the circuit court of St. Clair County against St. Mary's Hospital and eight other defendants alleging, *inter alia*, medical malpractice resulting in the wrongful death of her husband.

In November of 1981, Richard Decker began experiencing headaches and became irritable. By December, he was also experiencing hallucinations and delusions. He was admitted to the emergency room at Salem Memorial Hospital on the morning of December 13, 1981. The emergency room physician prescribed various drugs and released Decker. Decker's condition worsened throughout the day. He did not know who he was and was talking incoherently. Decker returned to Salem Memorial that evening where he denied any headache but was disoriented and spoke of various fictitious experiences. The emergency room physician diagnosed "situational reaction" and, along with Decker's treating physician, Dr. Lakshmanan, referred Decker to Dr. Meera Gandhy, a psychiatrist with staff privileges at St. Mary's Hospital.

Dr. Gandhy admitted Decker to St. Mary's, where she examined him and diagnosed psychotic depression and headaches of unknown etiology. She performed numerous diagnostic tests, including a neurological examination, a brain scan, and a CT scan, all of which yielded normal results. Although she suspected an aneurysm, Dr. Gandhy released Decker from the hospital and arranged for outpatient consultation on December 29, 1981, with instructions that if he were to experience any problems he was to call her immediately or report to the nearest emergency room. She also made an appointment for Decker to see Dr. Welch, a neurologist, on January 19, 1982.

Upon his release, Decker returned home and chopped wood for three or four hours. Mrs. Decker left later that evening to go bowling. When she returned, Mr. Decker's headaches had returned and he was acting strangely. Mr. Decker went to sleep, but around 5 a.m. he became more ill. Mrs. Decker called an ambulance, but Richard Decker was dead by the time it arrived. A subsequent autopsy revealed that the cause of death was a massive intracerebral hemorrhage which resulted from a ruptured aneurysm.

The first five counts of the complaint were directed at various drug manufacturers and alleged that the various drugs taken by Decker resulted in increased intercranial pressure and led to the fatal hemorrhage. The remaining four counts of the complaint were directed at St. Mary's Hospital, Salem Memorial Hospital, Dr. Lakshmanan, and Dr. Gandhy and alleged medical malpractice.

Soon after the complaint was filed, the count against Salem Memorial Hospital was voluntarily dismissed. The remaining defendants filed motions to transfer venue. In response, plaintiff argued that St. Clair County was the most convenient forum because of the proximity of the airport in St. Louis and the fact that Belleville was only 70 miles from Centralia, the location of St. Mary's Hospital. Plaintiff also asserted statutory venue, alleging that all five drug manufacturers did business in St. Clair County and that one, Pfizer, Inc., maintained offices and a factory in St. Clair County. Defendants' motions to transfer venue were denied.

Plaintiff served requests to produce and interrogatories on each of the five drug manufacturers. All but Pfizer were subsequently voluntarily dismissed by plaintiff. Subsequent depositions of plaintiff's experts established that Vistrail, the drug manufactured by Pfizer, played no role in Decker's death. Pfizer filed a motion for summary judgment, which was granted. Summary judgment was also granted in favor of Dr. Lakshmanan and plaintiff reached a settlement with Dr. Gandhy.

St. Mary's Hospital, now the sole defendant, filed a motion to transfer venue to Marion County or, in the alternative, to transfer the cause on grounds of *forum non conveniens* based upon the changed circumstances. St. Mary's motion to transfer was denied.

Ultimately, the case proceeded to trial on three counts. Count I alleged that Dr. Gandhy was the agent of the hospital and that the hospital was negligent by virtue of the acts and/or omissions of Dr. Gandhy. Count II alleged direct negligence by the hospital, and count III alleged negligence by the hospital based upon the doctrine of *res ipsa loquitur*.

At trial, Dr. Gandhy testified that while Mr. Decker was hospitalized, she did not inquire of any hospital personnel whether they had any other neurologist or neurosurgeon with whom she could consult. She decided to wait for an outpatient consultation because Decker seemed to be doing better. She also testified that Decker's psychiatric problems were independent of his later discovered aneurysm.

Plaintiff's expert, Dr. Levin, testified that had an aneurysm been diagnosed, it would have been operable. He gave no testimony regarding the standard of care for either Dr. Gandhy or the hospital, nor did he testify regarding any breach thereof. Dr. Adams, plaintiff's only other medical expert, testified that in his judgment Dr. Gandhy's care was deficient in that she failed to obtain a neurological or neurosurgical consultation. Dr. Adams gave no opinion regarding the hospital's standard of care.

Dr. Murphy, defendant's expert, testified that decedent suffered from a dissecting aneurysm that was both undiagnosable and untreatable. He opined that Dr. Gandhy did not deviate from the standard of care.

The jury returned separate verdicts on each of the three counts. The jury returned verdicts for the plaintiff on counts I and II and for the hospital on count III. The jury awarded damages of $360,000. Plaintiff filed a post-trial motion seeking a new trial on damages only, and defendant filed a motion for judgment notwithstanding the verdict. The trial court denied defendant's motion for judgment notwithstanding the verdict and granted plaintiff's motion for a new trial on the issue of damages. After a second trial, the jury awarded plaintiff damages in the amount of $1 million. This appeal followed.

On appeal, St. Mary's first argues that the trial court erred in refusing to enter judgment notwithstanding the verdict because plaintiff failed to present necessary expert testimony and because plaintiff failed to establish a claim based upon agency.

A judgment notwithstanding the verdict should be entered only where all of the evidence, when viewed in a light most favorable to the nonmoving party, so overwhelmingly favors the movant that no contrary verdict based upon the evidence could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.

With respect to its first contention, St. Mary's maintains that there was no expert testimony that it deviated from the appropriate standard of care, and that the absence of such testimony required a judgment for the defendant. A hospital has a duty to its patients to conform to the legal standard of reasonable conduct in light of apparent risk. (*Ohligschlager v. Proctor Community Hospital* (1973), 55 Ill. 2d 411, 303 N.E.2d 392.) While not an insurer of a patient's safety, the hospital owes the patient a duty of protection and must exercise a degree of reasonable care as the patient's known condition requires. (*Pickle v. Curns* (1982), 106 Ill. App. 3d 734, 435 N.E.2d 877.) In a malpractice action against a hospital, a plaintiff must prove that the hospital failed to comply with the applicable standard of care which guides institutions holding themselves out as devoted to the care and saving of human life and that such failure proximately resulted in the complained-of injury. (*Hansbrough v. Kosyak* (1986), 141 Ill. App. 3d 538, 490 N.E.2d 181; *Scardina v. Colletti* (1965), 63 Ill. App. 2d 481, 211 N.E.2d 762.) The standard of care that a hospital is held to is the accepted standard of care within the medical community. (*Johnson v. St. Bernard Hospital* (1979), 79 Ill. App. 3d 709, 399 N.E.2d 198.) Expert testimony is necessary to establish the applicable standard of care in malpractice actions against hospitals except where the hospital is so grossly negligent or the treatment is so common that a lay person could readily appraise it. (*Northern Trust Co. v. Upjohn Co.* (1991), 213 Ill. App. 3d 390, 399, 572 N.E.2d 1030, 1040; *Mielke v. Condell Memorial Hospital* (1984), 124 Ill. App. 3d 42, 463 N.E.2d 216.) In such cases, expert testimony is not required.

The function of a modern hospital is not limited to the narrow sphere of medical practice, nor does it simply provide facilities for treatment. As our supreme court has noted:

"[W]hile various medical judgments are necessarily a daily part of hospital administration, they do not constitute the entirety of a hospital's function, as is the case with single medical practitioners. Thus, we deem it appropriate to the diversity inherent in hospital administration that a broad range of evidence be available to establish the applicable standard of care." *Greenberg v. Michael Reese Hospital* (1980), 83 Ill. 2d 282, 293, 415 N.E.2d 390, 395-96.

Accordingly, evidence such as a hospital's accreditation standards, customs, policies, regulations, standards, State licensing requirements, and bylaws is admissible though it is not conclusive. *Andrews v. Northwestern Memorial Hospital* (1989), 184 Ill. App. 3d 486, 540 N.E.2d 447, citing *Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill. 2d 326, 211 N.E.2d 253; *Edelin v. Westlake Community Hospital* (1987), 157 Ill. App. 3d 857, 510 N.E.2d 958; *Taylor v. City of Beardstown* (1986), 142 Ill. App. 3d 584, 491 N.E.2d 803; *Block v. Michael Reese Hospital & Medical Center* (1981), 93 Ill. App. 3d 578, 417 N.E.2d 724.

Plaintiff maintains that Dr. Gandhy testified that because she suspected an aneurysm, she desired that Decker be examined by a neurologist during his stay in the hospital. When she inquired about a consultation with Dr. Welch, the neurologist who visited the hospital and saw patients on a monthly basis, she was told by Bill Carroll, the supervisory nurse of the psychiatric care unit, that Dr. Welch was on vacation. In fact, Dr. Welch was seeing patients at St. Mary's on December 22, 1981, while Decker was a patient. According to Anthony Del Vecchio, vice-president of St. Mary's, Carroll's duties included scheduling consultations if requested by a staff physician. Plaintiff also points out that the hospital bylaws specifically provide that the executive committee had a duty to ensure that its staff members obtained proper consultations. Plaintiff contends that the hospital had a duty under its own bylaws to ensure that Dr. Gandhy obtained a consultation, and that the hospital breached that duty when its employee, Bill Carroll, negligently told Dr. Gandhy that Dr. Welch was unavailable.

■ While the decision on whether to obtain a neurological consultation was a matter of medical judgment on the part of Dr. Gandhy, properly providing such consultation once she requested it was an administrative function. Informing Dr. Gandhy that Dr. Welch was unavailable, when in fact he was available, was evidence of negligence on the part of the hospital in performing this function. This was not a matter of medical judgment, and no expert medical testimony was required to establish the standard of care. With respect to the issue of proximate cause, Dr. Levin testified that had the arteriogram been performed, the aneurysm would have been detected and could have been corrected. Further, we conclude that no other expert testimony was required, as we find that the failure to properly schedule the requested consultation was an omission the results of which are within the common knowledge and understanding of the ordinary lay person. Under the facts of this case, the hospital had a duty under its own

bylaws to ensure that requested consultations were properly scheduled, and there was evidence that duty was clearly breached. (*Johnson*, 79 Ill. App. 3d at 718, 399 N.E.2d at 206.) Consequently, there was sufficient evidence to support a finding of negligence on the part of the hospital.

When all the evidence is viewed in a light most favorable to plaintiff, we cannot say that the evidence so overwhelmingly favors defendant that judgment for plaintiff cannot stand. *Pedrick*, 37 Ill. 2d at 510, 229 N.E.2d at 513-14.

■ St. Mary's also argues that plaintiff failed to establish a claim based upon agency. Because the plaintiff sufficiently established and proved a claim based upon the direct negligence of St. Mary's, we need not consider this contention. The jury specifically found for the plaintiff on the direct negligence theory, and therefore, any claim of error or inadequacy of proof with respect to the agency theory does not warrant reversal. See *Robertson v. General Tire & Rubber Co.* (1984), 123 Ill. App. 3d 11, 462 N.E.2d 706; *Kreke v. Caldwell Engineering Co.* (1982), 105 Ill. App. 3d 213, 433 N.E.2d 1337; *Liberty Mutual Insurance Co. v. Williams Machine & Tool Co.* (1974), 21 Ill. App. 3d 510, 316 N.E.2d 255, *aff'd* (1975), 62 Ill. 2d 77, 338 N.E.2d 857.

St. Mary's next maintains that the trial court erred in denying its motion for a change of venue to Marion County. St. Mary's contends both that plaintiff lacks statutory venue and that the case should have been transferred pursuant to the doctrine of *forum non conveniens*.

■ St. Mary's maintains that Pfizer was joined in bad faith. Plaintiff contends that St. Mary's waived this issue by failing to file its motion to transfer venue in a timely manner. Section 2—104(b) of the Code of Civil Procedure provides:

> "All objections of improper venue are waived by a defendant unless a motion to transfer to a proper venue is made by the defendant on or before the date upon which he or she is required to appear or within any further time that may be granted him or her to answer or move with respect to the complaint, except that if a defendant upon whose residence venue depends is dismissed upon motion of plaintiff, a remaining defendant may promptly move for transfer as though the dismissed defendant had not been a party." (Ill. Rev. Stat. 1989, ch. 110, par. 2—104(b).)

Four of the five drug manufacturers were dismissed upon motion of the plaintiff, but Pfizer was granted summary judgment in its favor. Plaintiff filed her complaint in December of 1983, and St. Mary's filed

its first responsive pleading on January 9, 1984. Pfizer was granted summary judgment on January 5, 1989. We need not address St. Mary's contention on this point, however, because we are not persuaded that Pfizer was joined in bad faith. Section 2—101 of the Code of Civil Procedure provides that an action may be commenced in any county of residence of any defendant who is joined in good faith. (Ill. Rev. Stat. 1989, ch. 110, par. 2—101.) St. Mary's contends that plaintiff's delay of over 16 months in pursuing her claim against Pfizer and her failure to oppose Pfizer's motion for summary judgment demonstrated that plaintiff joined Pfizer solely for the purpose of fixing venue in St. Clair County. Reviewing the record, we find that Pfizer was the manufacturer of one of the drugs given to decedent. During the discovery process, it was determined that the drug in question played no role in Decker's death. It was after this revelation that Pfizer sought and obtained summary judgment in its favor. Plaintiff disputes St. Mary's contention that bad faith was demonstrated by the fact that plaintiff did not oppose the motion, but assuming, *arguendo*, that she did not, we do not find this to be a particularly persuasive factor given that it was the depositions of plaintiff's own experts that disclosed the fact that the drug played no role in Decker's death. We also note plaintiff filed a motion to reconsider the order granting summary judgment in favor of Pfizer.

■ We next address St. Mary's contention that the cause should have been transferred pursuant to the doctrine of *forum non conveniens*. Transfer of an action pursuant to the doctrine of *forum non conveniens* rests with the discretion of the trial court, and the factors to be considered in whether to transfer an action are: (1) the availability of an alternative forum; (2) the access to the sources of proof; (3) the accessibility of witnesses; (4) the relative advantages and obstacles of obtaining a fair trial; (5) the congestion of the court dockets; and (6) the convenience of the parties. (*Bland v. Norfolk & Western Ry. Co.* (1987), 116 Ill. 2d 217, 506 N.E.2d 1291.) St. Mary's argues that a consideration of these factors clearly demonstrates that Marion County is the appropriate forum because both parties and the decedent resided in Marion County and the alleged negligence occurred in Marion County. St. Mary's also points out the relative congestion of the docket in St. Clair County as opposed to Marion County. Reviewing the record, we find that at the time of defendant's motion, four of the seven witnesses expected to be called at trial lived in St. Clair County and two others lived in adjoining St. Louis, Missouri. We cannot say that the trial court abused its discretion in denying the motion to transfer based on *forum non conveniens*.

 St. Mary's next argues that the trial court erred in introducing evidence of the medical staff bylaws, rules, and regulations. As we have noted above, hospital bylaws, rules, and regulations are admissible as evidence on the issue of the standard of care. (*Darling*, 33 Ill. 2d at 332, 211 N.E.2d at 257; *Rohe v. Shivde* (1990), 203 Ill. App. 3d 181, 560 N.E.2d 1113.) St. Mary's contends that the bylaws in question were the bylaws of the *medical staff*, not the hospital, and constitute evidence of what the *medical staff* knew or should have known, knowledge which should not be imputed to the hospital. We note, however, that Anthony Del Vecchio testified that although promulgated by the medical staff, the bylaws were subject to the approval of the hospital's board of trustees. The bylaws were relevant to the issue of the existence and scope of Dr. Gandhy's agency relationship with the hospital and to the issue of the standard of care. The medical staff, and its responsibility for the quality of care provided by the hospital, was subject to the ultimate authority of the board.

 St. Mary's next challenges the trial court's refusal to allow it to elicit from Toni Decker the source of decedent's referral to Dr. Gandhy. St. Mary's maintains that such testimony was admissible both for purposes of impeachment and as an admission. Reviewing the record, we find that Dr. Gandhy testified that decedent was referred to her by Salem Memorial Hospital. Exclusion of evidence does not constitute reversible error where such evidence is merely cumulative. (*Perez v. Hartmann* (1989), 187 Ill. App. 3d 1098, 543 N.E.2d 1023, citing *Malawy v. Richards Manufacturing Co.* (1986), 150 Ill. App. 3d 549, 501 N.E.2d 376.) Any error arising from the exclusion of Toni Decker's testimony on this point, or of the exclusion of the Salem Hospital records, was harmless.

 St. Mary's next argument with respect to the conduct of the first trial relates to the manner in which the jury was instructed. St. Mary's contends that the trial court erred in instructing the jury as to agency with respect to Dr. Gandhy. Having determined that the evidence supported a finding of direct liability on the part of the hospital, we need not consider these alleged errors. St. Mary's also argues that the trial court erred in instructing the jury on the hospital's duty. The instructions complained of, plaintiff's Nos. 28, 29, and 31A, are all clearly supported by *Darling* and its progeny.

St. Mary's final argument with respect to the manner in which the jury was instructed at the first trial is that the trial court erred in instructing the jury on the appropriate standard of care. St. Mary's contends that plaintiff's instructions Nos. 10, 11, and 12 (Illinois Pattern Jury Instructions, Civil, Nos. 10.01, 10.02, 10.04 (2d ed. 1971)

(hereinafter IPI Civil 2d)) erroneously told the jury that the defendant had a duty to exercise ordinary care and was to be judged by a reasonable man standard. As we have noted previously, however, the alleged negligence in this case does not relate to Dr. Gandhy's medical judgment, but to the hospital's failure to properly schedule the requested consultation. The instructions were therefore proper.

■ St. Mary's final contention of error with respect to the first trial is that the trial court erred in prohibiting St. Mary's from withdrawing Dr. Smith as an expert and in allowing plaintiff to comment thereon. Reviewing the record, we find that the trial court prohibited St. Mary's from withdrawing Dr. Smith as a discovery sanction. Plaintiff sought to depose Dr. Smith with respect to other cases in which he testified as an expert. Dr. Smith had indicated that, while such records were voluminous, he would produce them. These records were not produced at Dr. Smith's deposition, and by the fourth day of trial, when defendant sought to withdraw Dr. Smith, they still had not been produced. The trial court ordered defendant to produce Dr. Smith so that plaintiff could call him as a witness. Dr. Smith was never produced. As a continuation of the sanction, the trial court ruled that plaintiff could mention this fact to the jury. A trial court has broad discretion in imposing sanctions for discovery violations, and the exercise of that discretion will not be disturbed absent clear abuse. (*Ramos v. Pyati* (1989), 179 Ill. App. 3d 214, 534 N.E.2d 472.) Based upon our review of the record, we conclude that the trial court did not abuse its discretion.

The next issue we address is St. Mary's contention that the trial court erred in granting plaintiff a new trial on damages only. The trial court's decision was based upon the "destruction" of plaintiff's opening statement, the misquoted remarks of Sister Clarette, the violation of an order *in limine* by witness Del Vecchio, and defendant's failure to produce Dr. Smith as ordered.

■ During plaintiff's opening statement, the trial court instructed plaintiff's counsel that he could not use his exhibits unless they were marked by the court reporter. The wording of the trial court's order was vague and unclear, a fact that the trial court itself acknowledged in its order granting a new trial on damages, and plaintiff took the trial court's ruling to mean that he could not use the exhibits at all during his opening statement. Many of these exhibits went to the issue of damages. Clearly, a party is allowed to show exhibits, which will later be admitted into evidence, to the jury during the opening statement. (*LeMaster v. Chicago Rock Island & Pacific R.R. Co.* (1976), 35 Ill. App. 3d 1001, 343 N.E.2d 65.) As the trial

court itself acknowledged, its failure to clarify its ruling resulted in a misunderstanding which prejudiced plaintiff.

A second reason given by the trial court as a basis for granting a new trial on the issue of damages is the violation of its order *in limine*. Prior to trial, plaintiff filed a motion *in limine* requesting the court to enter an order precluding St. Mary's from making any reference to itself as a not-for-profit corporation. The following exchange took place:

"THE COURT: Let me make this suggestion. I think naturally St. Mary's Hospital—and you got a nun testifying—is going to—no one's going to think that that's a—one of the icons of the commercial enterprises.

MR. LEE: It's not I.B.M.

THE COURT: Yeah. And so I—I would suggest that in the trial memorandum, let me read that it's 'So and so v. St. Mary's Hospital, a not-for-profit corporation' and let's let it go at that.

MR. LEE: And I don't intend to ask anybody if it is a not-for-profit corporation. If that satisfies Mr. Cueto, that's fine with me.

MR. CUETO: Well, it doesn't satisfy me. But you've already ruled, Judge, I mean—

THE COURT: Well, I haven't ruled. I offered that as a suggestion.

MR. CUETO: I would—I would ask—I would object and ask the court not to read that in the trial memorandum.

THE COURT: Well, what you said was in response to my suggestion. Is that right, Mr. Lee?

MR. LEE: Yes.

THE COURT: That you won't further mention it and so forth?

MR. LEE: Right.

THE COURT: Okay. I'll read it into the memorandum and then we're done with the subject."

At trial, Del Vecchio was called as an adverse witness by plaintiff. When asked his occupation, Del Vecchio replied:

"I'm a Vice President at St. Mary's Hospital in Centralia, Illinois. It's a non-profit hospital, Catholic institution owned and operated by the Falechian [*sic*] Sisters."

During a recess, plaintiff made a motion for a default judgment based on the violation of the ruling on the motion *in limine*. Defense counsel acknowledged that he did not instruct the witness not to refer to

the hospital as being a not-for-profit corporation. The trial court took plaintiff's motion for default judgment under advisement and told defense counsel to caution his witnesses with respect to whatever motions *in limine* had been made. In its order granting a new trial on damages, the trial court indicated that reading to the jury from the trial memorandum the words "a not-for-profit corporation" after St. Mary's name was "probably *** erroneous" and that it attempted to limit the damage from such order by entering an order *in limine*. This is an apparent reference to the trial court's comment that "I'll read it into the memorandum and then we're done with that subject."

Noting the well-settled rule that for violations of an *in limine* order to serve as the basis for a new trial the order must be specific in its prohibitions and the violations must be clear, St. Mary's argues that the trial court's *in limine* order was not only vague but in fact was not an order at all. We disagree. After reviewing the record, we conclude that while the order was poorly expressed, the trial court did in fact enter an order *in limine* prohibiting any comment on St. Mary's status as a not-for-profit corporation, and while not a model of clarity, it was sufficiently clear to put defendant on notice that evidence or testimony of such status was not to be introduced. Further, defense counsel's comments, during both the discussion on the motion *in limine* and the discussion on plaintiff's motion for a default judgment, clearly demonstrate that he knew that an order *in limine* had been entered precluding such testimony. In the past, it has been noted that "[o]ral *in limine* motions provide fertile ground for confusion and misunderstanding during trial." (*Lundell v. Citrano* (1984), 129 Ill. App. 3d 390, 395, 472 N.E.2d 541, 545; *Reidelberger v. Highland Body Shop, Inc.* (1981), 83 Ill. 2d 545, 416 N.E.2d 268; see also *People v. Vazquez* (1990), 194 Ill. App. 3d 516, 551 N.E.2d 656.) This case demonstrates yet again the problems that can arise from oral *in limine* orders. We strongly advise that in the future *in limine* motions and orders be written so that all parties are clearly aware of exactly what evidence is to be excluded.

St. Mary's argues that plaintiff waived any potential error by failing to object when the witness made this comment in question. It has been held that where evidence is offered in violation of an *in limine* order, the opposing party must object or the issue will be considered to be waived. (*Carlson v. City Construction Co.* (1992), 239 Ill. App. 3d 211, 606 N.E.2d 400.) However, in the present case, plaintiff complained of Del Vecchio's violation as soon as was practicable. To have immediately voiced an objection would only have emphasized the objectionable testimony and exacerbated the damage. We find that plain-

tiff did not waive this issue by waiting until a recess to voice his complaint.

■■■ St. Mary's also argues that the trial court failed to apply or misapplied the appropriate analysis for awarding a new trial on the issue of damages only. The standard for making such a determination is well settled:

> " ' "A new trial on the question of damages only is appropriately granted 'where (1) the jury's verdict on the question of liability is amply supported by the evidence; (2) the questions of damages and liability are so separate and distinct that a trial limited to the question of damages is not unfair to the defendant; and (3) the record suggests neither that the jury reached a compromise verdict, nor that, in some other identifiable manner, the error which resulted in the jury's awarding inadequate damages also affected its verdict on the question of liability.' " ' " *Barr v. Groll* (1991), 208 Ill. App. 3d 318, 323, 567 N.E.2d 13, 16, quoting *Hollis v. R. Latoria Construction, Inc.* (1985), 108 Ill. 2d 401, 408, 485 N.E.2d 4, 7, quoting *Balestri v. Terminal Freight Cooperative Association* (1979), 76 Ill. 2d 451, 456, 394 N.E.2d 391, 393, quoting *Robbins v. Professional Construction Co.* (1978), 72 Ill. 2d 215, 224, 380 N.E.2d 786, 790.

In the present case, the trial court noted in its order granting a new trial that the jury's verdict clearly did not consider any loss of society, implicitly finding the award to be inadequate. Further, the verdict on liability was clear and amply supported by the evidence. St. Mary's contends that liability was predicated upon a single statement by plaintiff's expert. As we noted above, however, this was not a case of negligent medical judgment, but of administrative negligence in failing to obtain the neurological consultation. Also, we find that the questions of damages and liability are sufficiently separate and distinct that a new trial on damages only was not unfair to St. Mary's. None of the reasons set forth by the trial court for ordering a new trial related to the issue of liability. Finally, we find nothing in the record which suggests a compromise verdict. We conclude that the trial court correctly limited the second trial to the issue of damages only.

The trial court listed several other reasons for granting a new trial on damages only, but we need not discuss them as we find that the reasons discussed above, either individually or taken together, provide sufficient support for the trial court's action such that we cannot say the trial court abused its discretion.

St. Mary's also argues that the trial court erred in failing to grant St. Mary's a new trial after the second trial. St. Mary's maintains that the trial court erred in excluding evidence regarding the decedent's condition prior to his death and in allowing plaintiff's expert, Dr. Grossman, to testify.

Regarding the first contention, St. Mary's maintains that the trial court erred in precluding all evidence that decedent was suffering from a psychosis resulting in psychotic depression, hallucination, and delusions along with an inability to work. St. Mary's argues that not only did the plaintiff have the burden of proving that the decedent was in good health, but the excluded evidence was highly relevant, particularly in light of Dr. Grossman's testimony that the fact that decedent had not been released to work when discharged from the hospital would have an effect on his employability.

■■■ Reviewing the record, we find that there is no evidence indicating that decedent was not released to work because of his psychosis. When Dr. Gandhy discharged decedent from the hospital, her final diagnosis was headache of unknown etiology. She did, however, suspect the presence of an aneurysm. There is no evidence or testimony indicating that the nature of his psychotic condition rendered him unable to work. We conclude that the trial court did not err in excluding this evidence.

■■■ St. Mary's also argues that the trial court erred in allowing the testimony of Dr. Grossman, plaintiff's expert economist. St. Mary's maintains that Dr. Grossman failed to account for the fact that even if the aneurysm existed as described by plaintiff's expert, there was only a 5% chance that Richard Decker would have died. This fact is irrelevant as Richard Decker did in fact die from a ruptured aneurysm.

St. Mary's contends that there was no testimony received as to the employability of Richard Decker given his psychosis. St. Mary's maintains that Decker did not work after being diagnosed as having a psychotic depression reaction and that because Dr. Gandhy had not released Decker to return to work when he was released from the hospital, any testimony on lost wages was speculative. This argument is premised upon the assumption that Decker's psychotic depression rendered him unemployable, an argument which is not supported by the record. At the time of his death Decker was employed as a printer at World Color Press in Salem, Illinois. There was sufficient evidence in the form of Decker's 1981 tax return to support Dr. Grossman's testimony with respect to future earnings. St. Mary's argues that the tax return was a joint return for Toni and Richard

Decker and does not indicate whether any of the couple's income was attributable to Toni Decker's employment as a beautician. Dr. Grossman testified, however, that the tax return listed Toni Decker's occupation as "housewife" and that all of the income was attributable to Richard Decker.

St. Mary's also argues that Dr. Grossman was allowed to testify to actual dollar figures rather than expressing his testimony in the form of neutral numbers, and that he improperly incorporated future wage increases into his analysis. With respect to wage increases, Dr. Grossman testified that he considered the general level of wage increases that occurred between 1981 and the date of trial in determining Richard Decker's lost wages. We find nothing improper or speculative about this testimony. With respect to Dr. Grossman's failure to express his testimony in neutral figures, while it is true that neutral figures, as opposed to actual figures unique to the case, should be used in illustrating the mathematical process for compiling present cash value (*American National Bank & Trust Co. v. Thompson* (1987), 158 Ill. App. 3d 478, 511 N.E.2d 1206), we do not believe any potential error to be so prejudicial as to warrant a new trial.

St. Mary's next argues that the trial court erred in precluding it from questioning Dr. Grossman "regarding the amount his figures would earn for even one year." St. Mary's maintains that it was prejudiced by preclusion of this evidence but does not indicate how it was prejudiced thereby. Error in the exclusion or admission of evidence does not require reversal where there has been no prejudice or where the result of the trial has not been materially affected. (*Vaughn v. Granite City Steel Division of National Steel Corp.* (1991), 217 Ill. App. 3d 46, 576 N.E.2d 874.) We find that St. Mary's was not prejudiced and that the trial was not materially affected by the trial court's preclusion of this line of questioning.

St. Mary's also argues that the trial court erred in allowing Dr. Grossman's exhibits to go to the jury. Whether to allow exhibits to go to the jury room is within the discretion of the trial court. (*Thompson*, 158 Ill. App. 3d at 486, 511 N.E.2d at 1211.) After reviewing the record, we find no abuse of discretion in allowing the exhibits in question to go to the jury room during deliberations.

St. Mary's next argues that the trial court committed numerous errors in instructing the jury. Specifically, St. Mary's contends that the trial court gave duplicitous instructions in attempting to define the term "society" and erred in instructing the jury regarding the items it could consider in awarding damages.

■■ In defining the term "society," the trial court gave the following instruction:

"When I use the term 'society' in these instructions, I mean the mutual benefits that Holly Decker and Christopher Decker received and would have received from Richard Decker's continued existence, including love, affection, care, attention, companionship, comfort, guidance, and protection."

This is a modified version of IPI Civil 2d No. 31.11, which provides:

"When I use the term 'society' in these instructions, I mean the mutual benefits that each family member receives from the other's continued existence, including love, affection, care, attention, companionship, comfort, guidance, and protection."

(IPI Civil 2d No. 31.11 (2d ed. Supp. 1989).)

The modification substituting "Holly Decker and Christopher Decker" for the term "each family member" was necessary because Toni Decker had remarried and was no longer entitled to compensation for loss of society. A similar instruction was approved in *Singh v. Air Illinois, Inc.* (1988), 165 Ill. App. 3d 923, 520 N.E.2d 852, and in *Drake v. Harrison* (1987), 151 Ill. App. 3d 1082, 503 N.E.2d 1072. We find that the giving of the instruction as modified did not constitute error.

St. Mary's also contends that the trial court erred in giving plaintiff's instruction No. 7 rather than defendant's tendered instruction No. 1. Both are modified versions of IPI Civil 2d No. 31.04. IPI Civil 2d, No. 31.04 (2d ed. Supp. 1989).

Plaintiff's No. 7 provides:

"You must fix the amount of money which will reasonably and fairly compensate the widow and lineal next of kin of the decedent, for the pecuniary loss proved by the evidence to have resulted to them from the death of the decedent. 'Pecuniary loss' may include loss of money, goods, services and society.

Where the decedent leaves a widow and lineal next of kin the law recognizes a presumption that they have sustained some substantial pecuniary loss by reason of the death. The weight to be given this presumption is for you to decide from the evidence in the case.

In determining pecuniary loss you may consider what the evidence shows concerning the following:

1. What money, goods, and services the decedent customarily contributed in the past;

2. What money, goods, and services the decedent was likely to have contributed in the future;

3. Decedent's personal expenses and other deductions;

4. What instruction, moral training, and superintendence of education he might reasonably have been expected to give his children had he lived;

5. His age;

6. His sex;

7. His health;

8. His habits of industry, sobriety, and thrift;

9. His occupational abilities;

10. His physical and mental characteristics;

11. The relationship between Richard Decker and his children, Holly and Christopher Decker."

Defendant's tendered instruction No. 1 provides:

"You must fix the amount of money which will reasonably and fairly compensate the widow and lineal next of kin of the decedent, for the pecuniary loss proved by the evidence to have resulted to them from the death of the decedent. 'Pecuniary loss' may include loss of money, goods, services and society.

Where the decedent leaves a widow and lineal next of kin the law recognizes a presumption that they have sustained some substantial pecuniary loss by reason of the death. The weight to be given this presumption is for you to decide from the evidence in the case.

In determining pecuniary loss you may consider what the evidence shows concerning the following:

1. What money, goods, and services the decedent customarily contributed in the past;

2. What money, goods, and services the decedent was likely to have contributed in the future;

3. Decedent's personal expenses and other deductions;

4. What instruction, moral training, and superintendence of education he might reasonably have been expected to give his children had he lived;

5. His age;

6. His sex;

7. His health;

8. His habits of industry, sobriety, and thrift;

9. His occupational abilities;

10. His physical and mental characteristics;

11. The relationship between Richard Decker and his children, Holly and Christopher Decker;

12. Toni Decker is not entitled to damages for loss of Richard Decker's society and sexual relations."

Even though plaintiff's instruction No. 7 makes no mention of Toni Decker in item (11) of the list of factors to be considered in determining pecuniary loss, the instruction does tell the jury that it "must fix the amount of money which will reasonably and fairly compensate the widow" and that "[w]here the decedent leaves a *widow* and lineal next of kin the law recognizes a presumption that they will have sustained some substantial pecuniary loss." (Emphasis added.)

A reviewing court will not reverse a cause on the basis of an improper jury instruction unless, considering the instructions as a whole, the alleged improper instruction clearly misled the jury. (*Phelps v. Chicago Transit Authority* (1991), 224 Ill. App. 3d 229, 234, 586 N.E.2d 352, 355, citing *Nicholl v. Scaletta* (1982), 104 Ill. App. 3d 642, 432 N.E.2d 1267.) Viewing the instructions as a whole, it is by no means clear that the instruction in question misled the jury.

■■■ Finally, St. Mary's argues that plaintiff's closing argument constituted reversible error. St. Mary's advances numerous complaints with respect to the manner in which plaintiff's closing argument was conducted. The scope of closing argument is within the sound discretion of the trial court, and such argument will not warrant reversal unless it is so prejudicial as to have deprived the opposing party of a fair trial. (*Lewis v. Cotton Belt Route—St. Louis Southwestern Ry. Co.* (1991), 217 Ill. App. 3d 94, 576 N.E.2d 918.) Having reviewed the arguments advanced by St. Mary's in light of the record, we find that, even when considered together, plaintiff's closing argument was not so prejudicial as to deprive St. Mary's of a fair trial.

■■■ The defendant raises a number of other issues concerning instruction of the jury as well as evidentiary and other rulings of the trial court. We have examined each one and conclude that the contentions are either without merit or are so minor as not to constitute reversible error.

For the foregoing reasons, the judgment of the circuit court of St. Clair County is affirmed.

Affirmed.

CHAPMAN, P.J., and GOLDENHERSH, J., concur.