VICTORIA ANN MONKEN KREKE *et al.*, Plaintiffs-Appellees, *v.* CALDWELL ENGINEERING COMPANY, Defendant-Appellant.

Fourth District   No. 17231

Opinion filed March 25, 1982.

HEIPLE, J., dissenting.

Duane L. Traynor, of Traynor, Hendricks & Reed, of Springfield, for appellant.

Londrigan and Potter, of Springfield (James C. Craven, of counsel), for appellees.

JUSTICE ALLOY delivered the opinion of the court:

The defendant Caldwell Engineering Company appeals from the judgment of the circuit court in favor of plaintiffs in their action to recover damages for the death of their father, William Monken, under the construction injuries act (Ill. Rev. Stat. 1971, ch. 121, par. 314.1 *et seq.*).

The suit stemmed from the death of William Monken in November 1972, in an automobile accident which occurred near the intersection of Route 104 and U.S. 36-54. Defendant Caldwell was doing construction work in the area. The jury found liability and entered judgment, in the amount of $400,000, on behalf of the plaintiffs, all children of the decedent. From that verdict and judgment, Caldwell now appeals. It contends that the construction injuries act is not applicable to the facts of this case and that no liability under the act is justified. It further contends that the evidence was insufficient, as a matter of law, to show that any violation of the act was the proximate cause of the accident in which Monken was killed. Other issues raised by Caldwell address evidentiary rulings by the court, decisions on the pleadings, and an instruction. The issues will be specifically set forth in our discussion and analysis following presentation of the pertinent facts.

It is essential to an understanding of the case to have a clear view of the area in which the accident occurred, and for this reason the attached diagram, our composite based upon combined submitted exhibits and testimony, is included. This diagram was not an exhibit submitted in this cause.

The record reveals that defendant Caldwell Engineering was awarded the bid to remove the bridge or superstructure over the railroad tracks on U.S. Route 36-54, just east of the intersection of 36-54 with Route 104. Caldwell's contract with the State of Illinois contained special provisions

216

N

WESTBOUND 36-54

CLOSED PORTION 104

BARRICADES

TEMPORARY WESTBOUND 104

EASTBOUND 36-54

ORIGINAL PLACEMENT OF
REMOVED STOP SIGN

GUARDRAIL

WESTBOUND ROUTE 104

STOP SIGNS

EASTBOUND LANE ROUTE 104

KEEP RIGHT SIGN

addressing traffic control standards related to the proposed construction on 36-54. The applicable "signing" on 36-54 was set forth, as were the detour layouts for the project. A pertinent part of the plans for construction was the closing of that portion of Route 104 lying between the eastbound lanes of 36-54 and the westbound lanes of 36-54. A barricade was erected, preventing traffic northbound on Route 104 from proceeding normally on 104 at the intersection with 36-54. A barricade was also erected preventing traffic northbound on 104 from turning right, at the intersection, onto eastbound 36-54. Northbound traffic on 104 could neither turn right, nor proceed on 104 and then merge with westbound lanes of 36-54, as was the pre-existing pattern prior to construction. Rather, through the use of barricades, a detour was established which required all traffic coming north on 104 to turn left (westerly) and proceed along the formerly eastbound lanes of 36-54. Traffic off of 104 would proceed along those eastbound lanes until routed north, again by detour crossing, onto the two lanes of 36-54 which were formerly westbound. The formerly westbound lanes, however, were made two-way to accommodate the changes for construction. As is evident, considerable and significant changes in the traffic pattern at the intersection were necessitated. Northbound 104 traffic, which formerly could only have gone straight or turned right, was required to turn left, onto what had formerly been oncoming traffic lanes of 36-54.

In addition to the construction work, Caldwell was performing east of the intersection, it was also the contractor on work which was done at the intersection of 104 with 36-54. This work called for the removal of existing curbing on both sides of northbound 104 at its intersection with 36-54 and for the widening of the radius of the corners there.

The above-mentioned changes and traffic routing, along with barricades, are shown on the diagram referred to in this opinion.

Prior to construction, a conference was held between representatives of Caldwell and representatives of the State Traffic and Construction Division. As a result of the meeting, a traffic-standard sketch, showing necessary changes in signing in the area, was prepared. The initial sketch was unavailable at the time of trial, and there was a dispute in the evidence as to whether the lost sketch contained requirements for advance warning signs on 104, prior to the intersection with 36-54. Although in pretrial statements a senior Caldwell employee, who had attended the conference, stated that there was a temporary advance warning sign erected on 104 as it approached the intersection, at trial Caldwell conceded what photographic evidence conclusively demonstrated. There were no temporary advance warning signs on 104 to advise northbound traffic of the construction ahead or of the detour and traffic changes at the approaching intersection with 36-54.

The only change in Route 104 signing prior to the accident was the removal of a stop sign, with flashing red light atop, from the intersection of northbound 104 and 36-54. Originally, there were three stop signs at the intersection of northbound 104 and 36-54. There was one which stopped 104 traffic turning right onto the eastbound lanes of 36-54, prior to entering those eastbound lanes. There were two, one on each side of the 104 roadway, where 104 met 36-54, and then proceeded across the eastbound lanes of 36-54, to finally merge with the westbound lanes of 36-54. Both of these had flashers atop of the stop sign. The sign on the southwest side of the 104 roadway at the intersection was disconnected and removed in August 1971, by Egizii Electric Company, at the direction of State of Illinois personnel. The removal of the sign and its post was done to permit Caldwell to widen the turn at the intersection and to enable large trucks to turn left onto the westbound pavement as a detour. After the removal of that stop sign, there was one remaining on the southeast side of the 104 roadway, and one further east for traffic which would, after construction, again be able to make the right turn.

Other permanent signing along Route 104 as it approached the intersection included a railroad crossing sign approximately 1500 feet from the intersection, a "Stop Ahead" sign approximately 1100 feet from the intersection, a "Center Curb Ahead" sign about 900 feet from the intersection, a junction sign at about 700 feet, and then a "Keep Right" sign slightly back of the point of the median, some 300 feet before the intersection. As already indicated above, there were no temporary warning signs posted on Route 104 to indicate to northbound traffic that there was construction ahead, that part of 104 was closed ahead, or that a detour was ahead at the intersection.

The facts pertinent to the accident which took the life of William Monken are undisputed. Jo Ann Monken, mother of the five plaintiffs, and suing as next of kin for three of the minors, was the divorced wife of William Monken at the time of the accident. He and she had been divorced in October 1971. On the evening of the accident, being November 16, 1971, she had been bowling and had returned to her Chatham, Illinois, home around 11:30 p.m. Sometime thereafter, William Monken, who was then residing in Springfield, came to the house, wanting to talk with her. She asked if he was hungry or wanted a cup of coffee. He said he was not, but he indicated he would like to take a ride and talk with her. They left and took a drive. They drove south to Auburn, where they turned onto Route 104, heading westerly. They decided to go to Jacksonville to stop at a late-night cafe. They proceeded west and then northwesterly on 104 toward Jacksonville. Monken was traveling about 50 mph, and the road surface was dry. It was a clear night. Mrs. Monken testified that she had

no reason during the drive to be concerned about his operation of the auto. He had no restrictions on his license and did not wear glasses. He was wearing a seatbelt, a normal precaution of his, but she was not wearing her belt. As they drove along, she was in a position to see stop signs and other signs. When approaching the 104 and 36-54 intersection, just outside of Jacksonville, she did not notice anything out of the ordinary. She did not see anything indicating any construction in the area. She had never traveled on Route 104 previously. While driving they had discussed a variety of things, including the children and an upcoming birthday. As they were approaching the intersection with 36-54, heading northwesterly on Route 104, she noticed the railroad crossing some 1500 feet from the intersection. She also saw the "Stop Ahead" sign (1100 feet), the "Center Curb Ahead" sign (900 feet), and the "Keep Right" sign (300 feet). William Monken was looking ahead at the roadway, and she was turning from side to side while talking to him. She did see the signs, and she was aware of the "Keep Right" sign as the car approached it. The car slowed down as it proceeded upon the incline toward the intersection. She felt a slight pull as it went up, and testified that Monken was not speeding up the incline. She estimated the speed at 20-25 mph. His attention was directed to the highway as she talked. As they were going up the incline, within 100 to 150 feet of the intersection, she was looking at him and suddenly he said, "Oh my God Jo Ann." She looked and all she saw was a yellow flashing light. That was all she remembered until she woke up and found herself in the back seat of the car. According to police reconstruction, the Monken auto had swerved left, while braking, and then left the west edge of the 104 pavement, hitting the guardrail on the west edge. The guardrail begins about 100 feet from the intersection. The car then slid along the guardrail, went over it and then rolled over on its top and down the steep grade on the infield side of the guardrail.

Jo Ann Monken woke up in the back seat of the car. She got into the front seat, examined Monken, could not wake him, and could not get the doors open. She attempted to unfasten his seatbelt, but could not. She was then able to get herself out of the car, and she went for help down the road. When help finally arrived, in the form of fire and police vehicles and personnel, the car was in flames and Monken was dead.

Other evidence at trial, while disputed, indicated that there were construction trailers and machinery along the east side of Route 104, approximately 400 feet before the intersection. Plaintiffs' expert, a consulting traffic engineer, graphically indicated that the presence of the equipment would have made it difficult, if not impossible, for an approaching driver to see the signs at the intersection when his auto was beginning its approach up the incline ramp. It was also shown that the one

remaining stop sign with a flasher was located on the southeast side of the 104 roadway, considerably off to the right of the line of sight of a driver approaching the intersection from the direction the Monken car approached. This was the result of the fact that the roadway, after bifurcation at the median, curved considerably to the right. Furthermore, it was shown that the remaining sign with a flasher was on an elevation almost five feet higher than the elevation of the roadway from the railroad crossing (1500 feet) to the median bifurcation (400 feet).

The State highway patrolman who investigated the accident indicated that he drove southerly along 104 after the accident, on the night of November 16, 1971. He then approached the intersection from the direction that the Monken car had approached. He testified that he could observe the flashing stop light, when looking for it, at a distance of 1500 feet, nearby the railroad crossing on 104. However, he stated that he did not continue to check as to its visibility upon closer approach to the intersection. The officer, at the inquest, stated that in his opinion there were two possible causes of the accident. The first was that the driver was unfamiliar with the crossing and the other was that it was a construction site. He also testified that there was no evidence of excessive speed on the part of the Monken auto.

Both sides produced expert testimony on the issue of whether temporary signing was needed along Route 104 as it approached the intersection with 36-54. Plaintiffs' expert concluded that temporary signing, warning of construction and a detour, was necessary in order to advise motorists to slow down and be aware of possible changes in the direction of travel or other modifications due to construction. He based his conclusion on the dangerous nature of the intersection even before construction, the widening of the curve on 104 at the intersection, the presence of the trailers and equipment alongside 104, and the removal of the stop sign with flasher on the southwest side of the 104 highway at the intersection. Caldwell's expert, on the other hand, concluded that the existing signing on Route 104 was sufficient to warn oncoming traffic to slow down. He further concluded that Caldwell did not need to re-erect the stop sign that had been removed for their construction at the intersection.

In addition to the above witnesses, there was also considerable testimony on the issue of damages, which we need not detail in this opinion, as no issue with respect to the damage award is taken by defendant. Having set forth the pertinent factual background, we turn to the issues raised by Caldwell in seeking to reverse the judgment and obtain a new trial.

■■ ■ The first issue raised by defendant Caldwell is whether the construction injuries act (Ill. Rev. Stat. 1971, ch. 121, par. 314.1 *et seq.*) has application to the facts of the instant case. It is Caldwell's contention that the act did not require any advance warning signs on Route 104, because

there was no "major construction" being done on Route 104. Caldwell points to the fact that the construction work being done at the time of the accident was related to the overpass on U.S. 36-54, some distance east of the 104 intersection. We conclude, however, as did the trial court, that the act has application to the facts in this case. The construction injuries act is a safety statute designed to protect workers and the general public from injury or death during the construction or repair of bridges and highways within the State of Illinois. (*Vegich v. McDougal Hartmann Co.* (1981), 84 Ill. 2d 461, 468, 419 N.E.2d 918.) As a safety statute, this court is directed to adopt a liberal construction of it in order to effectuate the purposes of the statute and to afford broad protection to those the statute was designed to protect. (*Halberstadt v. Harris Trust & Savings Bank* (1973), 55 Ill. 2d 121, 127, 302 N.E.2d 64.) The pertinent section of the Act, section 4 (Ill. Rev. Stat. 1971, ch. 121, par. 314.4), states:

"Any portion of highway or bridge which is closed to all traffic shall be marked at each place where vehicles have accessible approach to such portion of highway or bridge, and at a sufficient distance from the closed portion of such highway or bridge shall be marked with an adequate number of safe, suitable, and proper warning signs, signals or barricades as set forth in the Manual of Uniform Traffic Control Devices for Streets and Highways published by the Department of Transportation so as to give warning to approaching motorists that such portion of bridge or highway is closed and unsafe for travel."

The Manual referred to in section 4, at its pages 190-91, states, in pertinent part:

"*Construction Approach Warning Signs.* Where major construction or maintenance is under way on a rural highway and any part of the roadway is obstructed or closed, it is necessary to give special advance warning, and for this purpose a series of Construction Approach Warning signs is provided in the following Sections. Because of their importance, these signs shall have a standard size of 48 inches by 48 inches. They shall be of the standard diamond shape for warning signs except as provided for in this Part under Design of Warning Signs.

*Application of Construction Approach Warning Signs.* Construction Approach Warning signs are for the purpose of alerting traffic, well in advance, to serious obstructions or restrictions due to road work. In rural areas where space permits there should be at least three such signs, at 500, 1,000, and 1,500 feet, respectively, in advance of the point of restriction.

* * *

Construction Approach Warning signs should be mounted on two

posts, from 6 to 12 feet from the pavement edge or on wing barricades at appropriate advance distances.

* * *

The Advance Road Construction sign (W20—1) is intended for use in advance of road construction projects as a general warning of possible obstructions or restrictions due to such work.

* * *

The Advance Detour sign (W20—2) is intended for use in advance of a point at which traffic is diverted over a temporary roadway or route.

* * *"

As noted, the purpose of the act is to protect motorists from injury or death where construction is occurring on a State highway. The purpose and intent of section 4, and the rules of the Manual to which it refers, are to insure that motorists approaching construction areas or obstructions due to construction are given adequate and sufficient advance warning of those conditions. Section 4 mandates advance warning when "any portion of highway * * * is closed to all traffic." The obvious purpose and value of such advance warning is to alert motorists that normal traffic flow and normal traffic conditions may have been changed. It alerts traffic, *in advance*, to take *special* caution and pay *special* attention in proceeding onward. It is completely clear in the instant case that advance warning signs should have been erected upon Route 104, as per the Manual, in order to warn motorists approaching the intersection that the traffic flow had been changed and the normal highway closed. The facts indicate that a portion of Route 104, that portion lying between the eastbound and westbound lanes of Route 36-54 had been closed completely to regular traffic. The closing of that portion of Route 104 was due to the construction work being performed by Caldwell. Traffic which would normally have proceeded onto that portion of 104 was detoured westerly into what previously had been the eastbound lanes of 36-54. There can be no doubt that there was a significant obstruction to the normal route of traffic on 104. This closing of 104 at the intersection and the rerouting of traffic would, by itself, have necessitated advance warning to motorists, under section 4 of the act. Certainly, motorists had every reason to expect to be forewarned of significant changes in the traffic pattern at the intersection, even if most of the actual construction were being done further east on 36-54. That construction directly involved Route 104 and the intersection of 104 with 36-54, for the construction on 36-54 necessitated the significant and substantial changes in traffic flow for motorists proceeding northwesterly upon Route 104. This portion of 104 and the entire intersection were an integral part of the overall construction work being done in the area by Caldwell. To focus blindly upon the area where actual

construction was being done, that is, the overpass, would be to ignore the realities of the situation and to ignore the purpose and intent of the act. Furthermore, there had been construction upon Route 104 at the intersection, in the nature of the widening of the curve on 104. That construction, which was substantially completed by Caldwell in August, had necessitated the removal of one stop sign at the intersection. There was construction on 104, but more importantly, a portion of 104 had been closed and the 104 intersection with 36-54 was part of the construction work being done by Caldwell in the area. Therefore, the construction injuries act had application to the facts of the instant case and required advance warning signs along Route 104.

■■ Caldwell's arguments against application of the act are unpersuasive. Caldwell places undue emphasis upon their restrictive reading of the highway manual referred to in section 4. They point to the language "where major construction or maintenance is underway" as limiting the application of the act. In the first place, we have already determined that the intersection of 104 and 36-54 was part of major construction being done by Caldwell in the area. Secondly, the act itself is clear and unequivocal as to its application: "where a portion of highway or bridge is closed to all traffic." There is no indication in the act that the legislature conferred upon the Department of Public Works and Buildings any authority to restrict or limit the clear language of section 4 in the act. Questions concerning application of the act must be decided upon the language of the act, where it is clear and unequivocal. The restrictive interpretation of the language in the manual is contrary to the language of the act and contrary to the rule requiring liberal construction of safety statutes. We reject such an interpretation. Nor is the case of *Tylitzki v. Triple X Service, Inc.* (1970), 126 Ill. App. 144, 261 N.E.2d 533, controlling. In that case, the court concluded that the act did not apply to an arterial road which led into a road which itself was under construction. (126 Ill. App. 2d 144, 147.) Cases under the act must be determined on their own facts and circumstances, and in that case no part of Roselle Road, the road plaintiff was riding upon, was shown to have been under construction or to have been closed to traffic. It has not shown that the road was an integral part of the construction operation underway on the intersecting roadway. The facts in the case at bar, as already detailed, are different, and they indicate that 104 was closed at the intersection and that the intersection was an integral part of the overall construction operation in the area. The act applies to this case, as indicated.

The next argument for reversal advanced by Caldwell is that, as a matter of law, its violation of the act, in failing to provide advance warning, was not a proximate cause of the accident. To support this position, Caldwell points out that there was a dispute in the trial testimony of the

experts as to whether such advance warning signs were necessary. It also argues that the existing signing on 104, indicating an intersection and a stop at the intersection, was sufficient and rendered any other warning signs unnecessary. We disagree. As to the necessity of advance warning signs, we have determined above that the act requires them and that they were necessary. The existing signing, detailed previously in this opinion, did nothing to alert oncoming traffic that there was anything unusual or hazardous ahead. The existing signing did not alert oncoming traffic that there might be obstructions due to construction work or equipment. It did not alert oncoming traffic that the intersection had been substantially altered, so that the normal flow of traffic was completely changed. It did not alert motorists that a detour was ahead. In sum, it did nothing to warn motorists to be especially careful and attentive when approaching the intersection, due to the conditions at the intersection. Advance warning signs, as required by section 4, would have alerted motorists of the necessity for additional, special caution and additional and complete attention to the oncoming situation. Advance warning signs would have alerted motorists to expect the unusual or unexpected when arriving at the intersection. It is evident from the testimony of Jo Ann Monken that William Monken was surprised by the situation he encountered on the incline approach to the intersection. We cannot know specifically what happened on that night. There was a "Keep Right" sign, and then a flashing red light over a stop sign on the right. There was a barricade, with yellow light, pointing left. We do not know whether William Monken was startled and surprised by the barricade, by the change of traffic pattern, and by seemingly inconsistent directions. We do not know if he feared oncoming traffic from the eastbound lanes of 36-54, not knowing it had been barricaded further up the road. We cannot know what specifically happened, but any of these explanations are inferences consistent with the evidence and the situation that night. Monken had come upon the ramp with no reason to suspect anything unusual and had found everything unusual and altered. The existing signing on 104 did nothing to prepare him for anything unusual. Had the proper and required signing been erected by Caldwell, William Monken may well have been more cautious about, and more attentive to, and more expectant of the changed conditions he encountered on 104 late that night. We find that the question of whether Caldwell's failure to erect proper and necessary advance warning signs was a proximate cause of the accident properly went to the jury for its determination.

■■ The next issues raised by Caldwell center upon allegations and proof by the plaintiffs that Caldwell violated article 107.22 of the Illinois Standard Specifications for Road and Bridge Construction. Article 107.22 states:

"Any traffic sign within the limits of construction which interferes with construction operations may be removed by the Contractor when authorized by the Engineer and reerected immediately at the temporary location designated by the Engineer. * * * As soon as construction operations permit, the sign shall be reerected at its permanent location in a workmanlike manner and to the satisfaction of the Engineer. The cost of all materials required and all labor necessary to comply with this provision will not be paid for separately, but shall be considered as incidental to the contract."

Plaintiffs' fifth amended complaint alleged the existence of this standard and a violation of it through Caldwell's failure to re-erect the stop sign that was removed so that their widening of the 104 intersection could be accomplished. Evidence was introduced at trial, indicating that the sign had been removed by a third party, at the direction of the State Engineer, in order to allow for construction at the intersection and the construction operations further east. It was not re-erected permanently or temporarily before the accident on November 16, 1971. Caldwell argues that since a third party removed the sign, at the direction of the State, it was thereby relieved of any duty it might have had to re-erect the sign, either during construction or after it had concluded construction on the intersection. From this position, it argues the court improperly permitted the allegation of a violation of article 107.22 to go to the jury and that it improperly allowed evidence of a violation to be presented to the jury. We disagree. The evidence indicated that the sign was removed by a third party at the direction of the State, but it also indicated that the removal was undertaken in order for Caldwell's construction to proceed on the widening of the 104 curve at the intersection. Once it had begun that work, it had principal responsibility to see to it that applicable standards were met. Furthermore, there was testimony, albeit disputed, that the stop sign on the northwest corner could have been re-erected at a temporary location. The contractor has the duty to comply with the State standards and that duty is imposed by virtue of the standards and their incorporation in the contract with the State. The fact that the State bore the initial cost for removing the sign does not relieve the contractor from its obligation and duty, under the contract, to see to it that the sign is re-erected at a temporary location. Standard 107.22 expressly provides that the contractor shall bear primary responsibility. Absent an express waiver of this provision by the State, the contractor has a continuing responsibility to meet State standards with regard to re-erection of removed signs. The contractor and the State both have obligations in this area, and the contractor cannot avoid his responsibilities by pointing to omissions or actions by the State.

■■ ■ Even assuming, *arguendo*, error in the submission of the 107.22 violation to the jury, the other allegations, setting forth violations of the

construction injuries act, were amply supported in the evidence. As noted, there was no question that Caldwell had failed to erect the necessary advance warning signs along Route 104. The jury's verdict is supported by the evidence of those violations. Even if the one count were defective, the other allegations fully sustain the verdict, and reversal would not be warranted. (Ill. Rev. Stat. 1979, ch. 110, par. 68(4); *Miller v. DeWitt* (1967), 37 Ill. 2d 273, 287, 226 N.E.2d 630.) Defendant concedes the correctness of the statement of law, but disputes the result, arguing the introduction of evidence with regard to the failure to re-erect the stop sign was highly prejudicial. Even assuming, *arguendo*, error in the submission of the 107.22 violation to the jury, the evidence with respect to the removal of the permanent sign and its lack of re-erection was proper evidence, relevant to the question of whether there was construction which occurred on Route 104, an issue disputed by defendant Caldwell. It was also evidence arguably relevant to the questions of whether, given the situation and circumstances at the intersection, advance warning signs were necessary and whether their omission was a proximate cause of the accident. As a consequence, even if no duty were to be imposed upon Caldwell to re-erect the removed stop sign, the evidence was properly admitted and considered by the jury.

■■ The final issues need not receive extensive treatment. Caldwell argues that the court erred in not permitting it to raise as a defense, in its answer, a question as to the decedent's willful and wanton misconduct. Caldwell had sought permission to amend its answer to plaintiffs' fourth amended complaint so as to include that issue. It is clear from the pleadings that Caldwell sought to raise the issue with respect to all of plaintiffs' allegations in their count I, the bulk of which were construction injuries act violations. There was no attempt by defendant to narrow the issue to the violation of 107.22, nor did Caldwell seek at the time to differentiate the 107.22 issue from the construction injuries act violations. It is established that:

> "Once a wilful violation of the act by a person in charge has been shown to be the proximate cause of plaintiff's injury, then any testimony regarding plaintiff's conduct is immaterial and irrelevant, since concurrent fault is not a defense to liability under the Structural Work Act." (*Beebe v. Commonwealth Edison Co.* (1977), 45 Ill. App. 3d 43, 48, 358 N.E.2d 1343. See *Vegich v. McDougal Hartmann Co.* (1981), 84 Ill. 2d 461, 466-67, 419 N.E.2d 918.)

The evidence of the decedent's conduct was admitted and properly went to the question of proximate cause, but the court properly refused to permit defendant to raise as a general defense the issue of the decedent's conduct.

Neither do we find error in the instruction on proximate cause, being Illinois Pattern Instructions, Civil, No. 180.19 (2d ed. 1971), which informed the jury that if it decided that plaintiffs had proven their case against the defendant, it was no defense that some third person, who was not a party, was also to blame. There was considerable evidence presented which raised a question as to the State's responsibilities to see that adequate and proper signing was erected upon Route 104 and in connection with the entire project. Given such evidence, and the obvious omissions by State personnel in seeing that all proper signing was accomplished, we find no error in the instruction objected to by Caldwell.

■■ Finally, we find no basis for reversal in the brief, unanswered question about insurance. A question was asked by a prospective juror during *voir dire*, but was not responded to by either counsel. Neither was the question invited by either counsel. We believe the trial court was in the best position to judge the effect and potential prejudice of this inadvertent mention of insurance by the prospective juror. We will not disturb his finding that no significant prejudice was shown to warrant a mistrial. *American State Bank v. County of Woodford* (1977), 55 Ill. App. 3d 123, 129-30, 371 N.E.2d 232.

The decision and judgment of the Circuit Court of Sangamon County is affirmed.

Affirmed.

BARRY, P. J., concurs.

JUSTICE HEIPLE, dissenting:

William Monken, late at night on the evening of November 16, 1971, was driving westerly on State Route 104 east of Jacksonville, Illinois. As he approached a stop sign, he reduced his speed from 50-55 miles per hour to 20-25 miles per hour. Then, while still about 100 feet from the stop sign, he veered to the left, hit the guardrail on the left, went over the guardrail and rolled down a grade. He was killed.

A close scrutiny of the record reveals no discernible reason for the accident. A reading of the majority opinion likewise sheds no light on this proposition. What is clear, however, is that the decedent's children obtained a $400,000 verdict against a blameless defendant and that the majority of this court wishes to affirm the verdict.

Sympathy and compassion are noble qualities. Without such feelings, life would be cruel, hard and unbearable. The loss of William Monken's life on the evening in question was tragic. Anyone knowing of this situation could not help but feel sorry for the surviving children. Certainly, the majority of this court is to be commended for that caring concern.

What is not commendable, however, is the majority's willingness to hang a $400,000 verdict on a party who had no responsibility for this accident, the Caldwell Engineering Company.

This lawsuit is grounded in the construction injuries act. In broad general terms, that statute imposes liability on road contractors during road construction in favor of the general public. The act requires contractors to adhere to certain safety standards as the posting of warning signs, etc. In the case at hand, defendant was indeed performing road construction on an intersecting highway, U.S. 36-54, at some distance east of the stop sign and intersection in question. They were performing no work on State Route 104 where the accident occurred, however. Thus, the statute had no application to this case. The construction injuries act applies only to parties traveling on a road under construction.

Because of the road construction on U.S. 36-54, however, traffic on State Route 104 was diverted at a point past the stop sign. It is important to note at this point that a mere road diversion does not constitute construction. Moreover, the accident took place at a point 100 feet before defendant even reached the stop sign. And it was *beyond* the stop sign where State Route 104 was diverted. Plaintiffs' decedent inexplicably ran off the road to his left approximately 100 feet before even reaching the stop sign.

*Tylitzki v. Triple X Service, Inc.* (1970), 126 Ill. App. 2d 144, is pertinent to the instant case. In *Tylitzki*, the plaintiff was traveling on Roselle Road approaching an intersection with Flagstaff Road. Roselle Road was not under construction. Flagstaff Road, however, was under construction approximately 80 feet from its intersection with Roselle Road. A collision occurred on Roselle Road between the plaintiff and a truck maneuvering to the construction site on Flagstaff Road. The court in *Tylitzki* concluded the plaintiff was not among the class of persons protected by the construction injuries act since the plaintiff was not traveling on the road under construction at the time of the accident.

The majority makes note of the fact that defendant had done some construction on State Route 104. Indeed they had. And they had finished their work a full 2½ months before the accident in question. That work was remote in time. The work on U.S. 36-54 was remote in place. Neither brought the construction injuries act into play in this case. End of lawsuit.

If, however, we assume for purposes of argument that the construction injuries act applies, even then, the plaintiffs cannot recover. For there is not one iota of evidence in the record that suggests that any abjured standard of the statute was the proximate cause of the accident.

The advance warning sign provision of the construction injuries act required three warning signs be set out at intervals of 500, 1000, and 1500 feet prior to the point of restriction. On the evening of the accident, 1100

feet from the intersection was a "stop ahead" sign. Nine hundred feet from the intersection was a "center curb ahead" sign. Seven hundred feet from the intersection was a sign which stated "JCT 36 and JCT 54." At the intersection itself were two stop signs. At least one had a flashing red light. Jo Ann Monken, decedent's divorced ex-wife, who was a passenger in the car and the only eyewitness, saw all these warnings along the highway with the exception of the stop sign at the intersection at which they never arrived. It is evident the decedent saw the same warnings along the road, as Mrs. Monken testified the decedent slowed down from 55 miles per hour to 20-25 miles per hour just before the accident. It is not clear how the presence of the advance construction signs would have caused the decedent to approach the intersection with more caution. Had he crashed through the intersection and detour barrier, it might be argued that the absence of the advance warning signs was a proximate cause of the accident. But he did not do that. Mr. Monken's car left the road 100 feet *before* the intersection. Something caused him to go off the road and lose control of his car. It wasn't because he didn't have adequate warning of the situation ahead. He had warning of the stop at the intersection. He heeded it. He slowed down in preparation of the stop ahead. Whether he was warned of a detour at 1500 feet, under the circumstances, was immaterial because that detour started only after he would have come to a stop at the intersection. And, it is uncontroverted that Mr. Monken had adequate advance warning of the stop at the intersection.

The majority admits they cannot know what specifically happened on the night of the accident. They concluded, however, that Mr. Monken "must have been surprised by the situation he encountered on the incline approach to the intersection." Then, they speculate about what must have occurred and that advance warning signs "may have" made Mr. Monken approach the intersection more cautiously. More cautiously? Mrs. Monken testified he had slowed the car to approximately 20 miles per hour just before he ran off the road, and this was still 100 feet before the intersection.

We instruct our jurors to determine the facts solely from evidence produced in open court. They are further instructed their verdict must be based on evidence and not upon sympathy or speculation. (Illinois Pattern Jury Instructions, Civil, No. 1.01 (2d ed. 1971).) Yet the majority reaches their conclusion by just such proscribed processes.

Thus, this case should be reversed for the dual reasons that the construction injuries act has no application to the case at hand. And even if the act should erroneously be held to be applicable, the evidence does not indicate that any violation of the act was or could have been a proximate cause of the accident.

Accordingly, I dissent.