CHICAGO TITLE AND TRUST COMPANY, as Guardian of the Estate of Steven A. Singleton, Jr., a Minor, *et al.*, Plaintiffs-Appellants, v. THOMAS J. BRESCIA, as Special Adm'r of the Estate of Emmanouel Capsopoulos, Deceased, Defendant (The City of Lake Forest, Defendant-Appellee).

First District (6th Division)   No. 1—94—3003

Opinion filed November 27, 1996.—Rehearing denied January 6, 1997.

Donald J. Nolan, of Chicago (Joseph T. McGuire, of counsel), and Kevin E. Bry, of Oak Park, for appellants.

674

Flynn, Murphy, Ryan & Seyring, of Chicago (Richard T. Ryan and Mark F. Smolens, of counsel), for appellee.

PRESIDING JUSTICE ZWICK delivered the opinion of the court: Plaintiffs' decedent, Steven A. Singleton, was killed on May 11, 1989, when the sewer trench in which he was working collapsed. Plaintiffs sought recovery under the Structural Work Act (740 ILCS 150/0.01 *et seq.* (West 1994)) against the City of Lake Forest and several other defendants involved in the construction project. After trial, the jury returned a verdict in favor of the City of Lake Forest and against plaintiffs, finding that the municipal defendant was not liable because it was not in charge of the construction project that resulted in the death of plaintiffs' decedent.

On appeal, plaintiffs contend that (1) the trial court erred in denying their motion for judgment notwithstanding the verdict, (2) comments made by defense counsel prejudiced plaintiffs and constituted reversible error, (3) the trial court erred in admitting improper evidence of OSHA standards, (4) the trial court erred in allowing defendant's expert witness to testify as to the entity "in charge of" the sewer project, (5) the trial court erred in instructing the jury on Lake Forest's claim that the actions of another entity constituted the sole proximate cause of the accident that resulted in the decedent's death, (6) the trial court erred in dismissing Lisa Williams, the mother of decedent's children, as a plaintiff, (7) improper conduct of defense counsel during trial constituted reversible error, and (8) other trial errors require reversal.

The record reveals that in 1986, Emmanouel Manolopoulos and his wife Irene purchased a vacant parcel of property located at 1325 West Conway Road in the City of Lake Forest, Illinois. They decided to build a house at that location and hired Emmanouel Capsopoulos, d/b/a Caps Construction (Capsopoulos), as the general contractor. Construction of the home began in the fall of 1988. The Manolopouloses opted to connect their new home to the existing municipal sewer system, and Capsopoulos hired a subcontractor, Garland Davidson, d/b/a Davidson Sewerage & Drainage (Davidson), to do the sewer work. The plaintiffs' decedent, Steven Singleton, was employed by Davidson on the sewer extension project when he was killed.

At trial, the jury heard conflicting testimony about the role played by the City of Lake Forest in this construction project.

Plaintiffs presented the testimony of Samuel Miles, Bobby Joe Aldridge, and Ernest Glen Judd, all of whom were former employees of Davidson who had worked on the sewer extension project. Each of these witnesses testified as to the actions of Leonard Hardy, an inspector employed by the City of Lake Forest.

Samuel Miles, the backhoe operator for Davidson on the sewer extension project, testified that shortly after he had started excavation, Hardy interrupted him and issued directions regarding the placement of barricades and relocation of the excavation near the existing sewer line. Davidson, Miles' employer, instructed him to comply with the wishes of Hardy. Miles testified further that Hardy required the Davidson workers to fashion an auxiliary road to reroute traffic around the construction project. According to Miles, Hardy also directed that shoring be constructed in the hole, that a concrete box be constructed in the trench, and that the surface blacktop be cut around the manhole. In addition, Hardy instructed and assisted the Davidson workers in the formation of an improvised transit device to aid in levelling the pipe. Hardy also instructed the workers to backfill immediately upon laying the pipe. Miles testified that Hardy was at the construction site at least once every day, typically staying only a few minutes, but sometimes as long as an hour. Hardy was at the site three times on the day of the accident. Just prior to the collapse, Hardy had been in the trench to check the elevation of the pipe and to see whether it was level.

Bobby Joe Aldridge, a former employee of Davidson, who was in the trench and was injured when it collapsed, corroborated the testimony of Miles regarding the conduct of Leonard Hardy. Aldridge stated that Capsopoulos told him to do as Hardy said, and Aldridge believed that Hardy was in a position to instruct the workers.

Ernest Glen Judd, another former employee of Davidson, testified to substantially the same facts as Miles and Aldridge regarding the actions of Leonard Hardy.

Plaintiffs called Claude Hurley and Charles Schultz as expert witnesses.

Claude Hurley testified that the City of Lake Forest was in charge of the work at the construction site. Hurley's opinion was based upon the fact that Lake Forest was the owner of the property, acted as a resident engineer for the project, and was recognized by Davidson and his employees as a superior entity at the work site. In support of this conclusion, Hurley noted that correspondence signed by Ronald Behm, the city engineer, reflected that the city had dictated when and where the work was to be done, what specifications would be applied, and referenced the materials to be used. In addition, Lake Forest conducted a detailed review of the project that had been prepared by George Kougan, the initial engineer who had withdrawn from the project in November 1988. According to Hurley, Lake Forest effectively became the project engineer because no replacement was named after Kougan's resignation. Hurley indicated that this was an

unusual situation and that a property owner would normally have a consultant perform in an engineering capacity at a jobsite.

Hurley testified that one of these letters from Behm stated that if the work was not completed by May 1, 1989, the city would stop all work on the project. Hurley stated further that Lake Forest was involved in the field operations because Leonard Hardy, the city's inspector, was on the site personally each day and actually did some physical work on the site, including alignment of the sewer pipe, positioning stakes, monitoring the work on a daily basis, and instructing the workers as to how things were to be done, how and what changes in operations should be accomplished in order that the sewer be constructed in a workmanlike fashion. In Hurley's opinion, Lake Forest had an obligation to see that a safe and correct method was used, and it was obligated to stop the work if it was not being done without danger to the workers.

Hurley testified further that the Structural Work Act had been violated by cutting through the profile soils to the bottom of the trench in an unsafe manner, creating an unstable situation. A simple trench box could have been used to protect the workmen. Additionally, a more permanent excavation support system could have been used or a less vertical slope would have been an appropriate safety measure to prevent a cave-in. Also, the trench could have been shored to protect the workers.

Charles C. Schultz testified that the custom and practice in the construction industry established a number of methods to protect workers in a trench from the danger of a collapse. These methods included installing vertical trench walls, shoring the trench, having a trench box, and sloping the trench walls. In Schultz's opinion, Lake Forest and Capsopoulos were "in charge of" the sewer extension project and had a responsibility to see that a safe and suitable workplace was provided for the workers in the trench. Schultz based this conclusion upon the facts that Lake Forest owned the property on which the construction took place, issued construction permits, and sent out correspondence regarding the project. Schultz stated that the city's obligations included compliance with the custom and practice of shoring trenches that are over five feet deep. According to Schultz, those entities that were "in charge of" the sewer extension project wilfully violated the Structural Work Act.

Testifying on behalf of the City of Lake Forest were Leonard Hardy, an inspector, and Ronald Behm, the former city engineer.

Leonard Hardy, an engineer's assistant for the City of Lake Forest, testified that his job duties include performance of inspections for construction projects such as water main or sewer replacement.

Hardy testified that his inspection of the sewer extension project was designed to verify the appropriateness of the line and grade of the pipe, the type of pipe being installed as well as the type of backfill and bedding material being used. Hardy stated that he made an effort to visit the construction site twice each day, and he stayed approximately 15 minutes. Hardy testified that he checked the piping, the backfill and the bedding material. Hardy denied that he told the workers that they had started excavation at the wrong end of the project. Hardy acknowledged that he suggested to the Davidson workers a technique to alleviate a problem with the pea gravel while they were excavating near an existing manhole. Other than the problem with the pea gravel, Hardy did not notice any problems with the sides of the trench. During his visit to the site on the day of the accident, everything seemed to be going well, and he had never been informed of any cave-ins or problems with the walls. Hardy testified that during his inspections, he monitored the materials being used as well as the performance of workers installing the pipe and the backfill. Hardy did not recall assisting the Davidson workers while they levelled the pipe, but he acknowledged that he had been "partially" in the trench.

Ronald Behm, the former engineer for the City of Lake Forest, testified that the Manolopouloses contacted him in the summer of 1988 because they wanted to connect the existing sewer system to the new home they were building on Conway Road. Behm sent them a letter indicating what was needed and outlining the city's standards for sanitary sewer construction.

Behm testified that the city's standards were designed to inform the project engineer what the sewer was to look like when completed, and the standards included a description of materials, construction standards, and details as to how manholes should be constructed. Behm stated that the city's standards were not specifications, but could be used to create specifications.

Behm admitted that Hardy's setting of the grade stake constituted involvement by an engineer and that the city was concerned about the surrounding traffic, including public safety and access.

According to Behm, the city's supervision and control over the project pertained only to making sure that the city's standards were met. The city did not supervise or control the workers and made no decisions regarding the days or hours worked, payment or the length of time the project took. Behm testified that the city neither retained authority to issue change orders, nor did it have any responsibility for safety precautions on the project. Because the city was not at the site constantly, it was not in a position to assure worker safety. In

addition, the city had no control over the contractor except if it was discovered that the contractor was using the wrong type of product or the wrong grade. Behm expressed his opinion that the employer was responsible for the safety of the workers at the construction site.

Behm acknowledged that the city code delegated to him the duty to "superintend and supervise all public works and public improvements." Behm stated that, upon completion, the sewer extension project would constitute a public improvement. Behm admitted that the city assumed certain duties of the project engineer, including setting the grade stake, backfilling after the accident, and final pavement patching. Behm testified that in April 1989, he sent a letter to the homeowners explaining they could have their sewer projects included in the special tax district. Behm stated this was an effort to accommodate the homeowners, not to punish them.

Defendant Lake Forest called Scott Sebastian as an expert witness. Sebastian testified that, in his opinion, Capsopoulos, the general contractor, and Davidson, the sewer subcontractor and the decedent's employer, were "in charge of" the sewer extension project and had violated the Structural Work Act by not making the trench safe for the workers. Sebastian also testified that by failing to shore the sewer trench, Capsopoulos and Davidson had violated custom and practice within the industry with regard to providing a safe working place for employees.

Sebastian stated further that an owner would be considered "in charge of" the work if that entity has hired construction managers for various parts of the work, has assumed responsibility to directly subcontract or to perform portions of the work, or has devised master schedules to correlate the subcontractors. In Sebastian's opinion, Lake Forest merely made periodic inspections and gave only those directions required to ensure that the sewer line would function properly when completed. Sebastian concluded that defendant Lake Forest was not responsible for protecting the trench or for making it safe for the workers. In addition, Lake Forest did not violate industry standards or state or federal regulations.

Upon consideration of the evidence, the arguments of counsel, and the applicable instructions, the jury returned a verdict in favor of the City of Lake Forest and against the plaintiffs, finding that this municipal defendant was not "in charge of" the sewer extension project. Plaintiffs have appealed the jury's verdict, asserting several trial errors as grounds for reversal.

We initially address plaintiffs' claim that the trial court erred in denying their post-trial motion for entry of judgment notwithstanding the verdict.

■ A judgment *non obstante veredicto* (*n.o.v.*) is properly entered only in those limited cases where all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510, 229 N.E.2d 504 (1967). In ruling on a motion for judgment *n.o.v.*, the trial court is not permitted to weigh the evidence, nor is it concerned with the credibility of the witnesses; rather, it may only consider the evidence, and any inferences therefrom, in the light most favorable to the nonmovant. *Maple v. Gustafson*, 151 Ill. 2d 445, 453, 603 N.E.2d 508 (1992). The trial court has no right to enter a judgment *n.o.v.* if there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome. *Maple*, 151 Ill. 2d at 454. Entry of a judgment *n.o.v.* is improper where reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented. *Wade v. City of Chicago Heights*, 216 Ill. App. 3d 418, 441, 575 N.E.2d 1288 (1991).

Plaintiffs contend that the trial court should have entered a judgment *n.o.v.* finding Lake Forest liable under the Structural Work Act because the evidence presented at trial established that Lake Forest "had charge of" the sewer extension project and had "willfully violated" the provisions of that statute.

■ To maintain a cause of action against a defendant under the Structural Work Act (the Act) (740 ILCS 150/0.01 *et seq.* (West 1994)), the plaintiff must establish, among other elements, that defendant "had charge of the work" that proximately caused the injury. *Cockrum v. Kajima International, Inc.*, 163 Ill. 2d 485, 491, 645 N.E.2d 917 (1994). The Illinois Supreme Court has held that the term "having charge of" is one of common usage and understanding, and any attempt to provide the jury with a specific definition of this term can only lead to confusion and error. *Larson v. Commonwealth Edison Co.*, 33 Ill. 2d 316, 323, 211 N.E.2d 247 (1965). Although this term may include supervision and control, it is not confined to those elements. *Larson*, 33 Ill. 2d at 321. The court must consider the totality of the circumstances in determining whether the evidence supports a finding that a party was "in charge of" the work. *Norton v. Wilbur Waggoner Equipment Rental & Excavating Co.*, 76 Ill. 2d 481, 490, 394 N.E.2d 403 (1979), citing *McGovern v. Standish*, 65 Ill. 2d 54, 68, 357 N.E.2d 1134 (1976); *Ryan v. E.A.I. Construction Corp.*, 158 Ill. App. 3d 449, 457, 511 N.E.2d 1244 (1987).

More than one entity may be deemed to be "in charge of" the

work within the meaning of the Act. *Emberton v. State Farm Mutual Automobile Insurance Co.*, 71 Ill. 2d 111, 123, 373 N.E.2d 1348 (1978). The determination of whether a defendant is a person "having charge of" the work is primarily a factual inquiry, which involves numerous factors, including those enunciated in *Chance v. City of Collinsville*, 112 Ill. App. 3d 6, 11, 445 N.E.2d 39 (1983). See *Cockrum*, 163 Ill. 2d at 492; *Simmons v. Union Electric Co.*, 104 Ill. 2d 444, 452, 473 N.E.2d 946 (1984).

■ Those factors that are relevant to this inquiry include (1) supervision and control of the work; (2) retention of the right to supervise and control the work; (3) constant participation in ongoing activities at the construction site; (4) supervision and coordination of subcontractors; (5) responsibility for taking safety precautions at the jobsite; (6) authority to issue change orders; (7) the right to stop the work; (8) ownership of the equipment used on the jobsite; (9) defendant's familiarity with construction customs and practices; and (10) defendant's ability to assure worker safety or alleviate equipment deficiencies or improper work habits. *Cockrum*, 163 Ill. 2d at 492-93, citing *Chance*, 112 Ill. App. 3d at 11.

■ Defendant Lake Forest presented evidence that the contract executed between Capsopoulos and Davidson placed Davidson and Caps Construction in charge of the sewer extension project. The contract provided that Davidson was to supply the labor and materials for the project, subject to Capsopoulos' satisfaction. The City of Lake Forest was not a party to any of the contracts concerning the sewer extension and had no involvement in the decision to hire Davidson as subcontractor. Lake Forest did not have a representative constantly present at the work site. On those occasions when Hardy was present, he issued instructions designed to ensure that the sewer line was installed in accordance with the city's requirements. He did not participate in the ongoing activities at the site. The city undertook no responsibility for guaranteeing the safety of the workers and had no authority to issue change orders. Lake Forest neither owned nor provided materials or equipment at the work site and did not maintain an office or other official presence on the scene. The wages and working hours of the employees working on the project were determined by Davidson, their employer, not by Lake Forest. The Manolopouloses initiated and paid for the sewer extension project, and the taxpayers of Lake Forest were not involved in any way.

Lake Forest also presented evidence indicating that the city's involvement with the sewer project was limited to requiring Capsopoulos and Davidson to follow certain construction standards. The testimony of Ronald Behm and Len Hardy indicated Hardy made

periodic visits to the work site to ensure that the new sewer line would operate properly. Hardy's inspections were intended to ensure that proper materials were being used and that the sewer pipe was at the proper grade and depth and that the sewer was correctly installed; it was not to ensure worker safety or to supervise or control the work.

The city also presented evidence that its concerns were limited to protection of the community's health and safety, protection of public property, and assurance that the sewer extension was mechanically sound. To achieve these goals, the city required Davidson and Capsopoulos to comply with certain sewer construction standards, obtain a bond, obtain permits, and submit acceptable sewer specifications and plans to the city surveyor and engineer. Such actions constituted a proper exercise of the city's police power to protect the community's health and safety. *Chance*, 112 Ill. App. 3d at 11. Conducting inspections to determine whether the work is being done properly is insufficient to find a municipal defendant "in charge of" the work under the Act. *Chance*, 112 Ill. App. 3d at 13.

This evidence, viewed in the light most favorable to Lake Forest, did not so overwhelmingly favor plaintiffs that no contrary verdict could ever stand. Rather, the evidence and reasonable inferences to be drawn therefrom were sufficiently balanced to present a disputed question of fact as to Lake Forest's claim that it was not "in charge of" the sewer extension project. Consequently, the trial court acted properly in denying the plaintiffs' post-trial motion for judgment *n.o.v.* in this case. See *Sandburg-Schiller v. Rosello*, 119 Ill. App. 3d 318, 335, 456 N.E.2d 192 (1983).

We next consider plaintiffs' contention that the trial court erred in admitting expert testimony introduced by defendant. Specifically, plaintiffs complain that Scott Sebastian, the expert witness called by Lake Forest, was improperly permitted to define the term "in charge of" and that the definition offered by Sebastian was incorrect.

The record reveals that Sebastian testified as follows:

"[T]he person or entity that [is] in charge of the work is the one who is in control of the work, the one who has been hired to physically install the work, the person that decides where to get the materials, what machinery is going to be used to do the job, how many men, what types of trades are going to be involved in it.

That's the only individual or entity that would exercise the control over the operation that would have been mandated that some slope protection would have been employed.

Nobody else other than the employer or the person that hired the subcontractor could have exercised that kind of authority or control.

\* \* \*

In order to violate the Structural Work Act, you need to be in control of the work.

You have to be in a position to stop the work, to start the work, to decide whether you're going to use a backhoe to dig the hole or whether you're going to dig it out with shovels.

\* \* \*

And to that end, either a subcontractor or a general contractor would be in control of the work.

\* \* \*

I've never seen an owner take an active role in supervising the physical installation of the work. I've never seen that."

■ Earlier cases held that expert testimony was inadmissible if it pertained to matters within the knowledge or experience of jurors. However, more recent decisions hold that expert testimony is admissible whenever it will assist the trier of fact to understand evidence or to decide a fact in issue that is difficult to comprehend or to explain. *Thacker v. UNR Industries, Inc.*, 151 Ill. 2d 343, 365, 603 N.E.2d 449 (1992); *Merchants National Bank v. Elgin, Joliet & Eastern Ry. Co.*, 49 Ill. 2d 118, 122, 273 N.E.2d 809 (1971); *Hernandez v. Power Construction Co.*, 73 Ill. 2d 90, 99, 382 N.E.2d 1201 (1978); *Dotto v. Okan*, 269 Ill. App. 3d 808, 810, 646 N.E.2d 1277 (1995). In addition, an expert may testify to the ultimate issue in the case because the jury is free to reject that opinion. *Merchants National Bank*, 49 Ill. 2d at 122; *Van Holt v. Amtrak*, 283 Ill. App. 3d 62, 72 (1996) (expert may offer testimony on ultimate issue of whether the defendant was "in charge of" the work under Structural Work Act).

■ Thus, although Sebastian could express his expert opinion as to the entity that was "in charge of" the sewer extension project, it was improper for the court to allow him to define that term. *Larson*, 33 Ill. 2d at 323 (any attempt to define the term "in charge of" can only lead to confusion and error). This error was exacerbated by the fact that the definition given by Sebastian inaccurately stated that either a subcontractor or a general contractor would be in control of the work, and nobody else other than the employer or the person that hired the subcontractor could have exercised the kind of authority or control sufficient for them to be "in charge of" the work.

Consequently, we hold that the trial court committed reversible error in admitting Sebastian's definition of the term "in charge of," and we reverse and remand for a new trial. We consider other issues raised by plaintiffs only to the extent that they concern matters that may occur again on retrial.

Plaintiffs argue that the trial court erred in dismissing the individual claim asserted by Lisa Williams. The record reveals that the trial court granted Lake Forest's motion to strike that asserted only that, "since Lisa Williams claims she was never married to [the decedent], no claim can be made on her behalf." In the prayer for relief, the motion requested that the court strike "the claim of Lisa Williams for any claim of damages under the Wrongful Death Statute."

The trial court ruled that plaintiff Lisa Williams was precluded from bringing an individual claim because she and the decedent were not married. In entering this ruling, the court made reference to the Wrongful Death Act, which provides a right of action for only the surviving spouse and next of kin of the deceased (740 ILCS 180/2 (West 1994)). Williams acknowledges that because she was not the spouse of the decedent, she was not entitled to seek recovery under the Wrongful Death Act. However, her individual claim for damages was not predicated upon that statute, but was premised upon section 9 of the Structural Work Act.

■ Section 9 of the Structural Work Act provides that when a worker is killed on the job due to a willful violation of the Act, a right of action accrues to the surviving spouse of the person killed, the lineal heirs or adopted children, "or to any other person or persons who were, before such loss of life, dependent for support on the person *** killed." 740 ILCS 150/9 (West 1994).

The parties have not cited,[1] nor has our research disclosed, any case that directly addresses the question of whether a person who was not the spouse, lineal heir or adopted child of the decedent, but was dependent upon the decedent for support, is entitled to assert a claim for damages under section 9 of the Structural Work Act. Thus, this case presents an issue of first impression in Illinois.

Although this issue has not previously been decided in the reviewing courts, it constitutes a simple matter of statutory interpretation. In construing a statutory provision, the primary objective is to ascertain and give effect to the intent of the legislature. *Nottage v. Jeka*, 172 Ill. 2d 386, 392, 667 N.E.2d 91 (1996); *Harvel v. City of Johnston City*, 146 Ill. 2d 277, 282, 586 N.E.2d 1217 (1992). In accomplishing this objective, courts first look to the words of the statute because the language used by the legislature is the best indication of legislative intent. *Nottage*, 172 Ill. 2d at 392; *Harvel*, 146 Ill.

---

[1]Indeed, the brief filed by defendant Lake Forest fails to respond to plaintiffs' claim in violation of Supreme Court Rule 341(e)(7). 134 Ill. 2d R. 341(e)(7).

2d at 282. If the language used in the statute is clear, it is unnecessary for the court to resort to other tools of statutory interpretation. *Nottage*, 172 Ill. 2d at 392. Courts of review may not, under the guise of statutory construction, add requirements or impose limitations that are inconsistent with the plain meaning of the enactment. *Nottage*, 172 Ill. 2d at 392.

■ Section 9 specifically creates a right of action *"to any other person or persons who were *** dependent for support on the person *** killed."* (Emphasis added.) 740 ILCS 150/9 (West 1994). This language unequivocally recognizes a class of claimants that is separate and distinct from the decedent's spouse, lineal heirs or adopted children.

Illinois courts have long recognized that claims brought pursuant to the Structural Work Act are different from and entirely independent of those asserted under the Wrongful Death Act or the Survival Act. See *Schrock v. Shoemaker*, 159 Ill. 2d 533, 540, 640 N.E.2d 937 (1994), citing *Page v. Hibbard*, 119 Ill. 2d 41, 47-48, 518 N.E.2d 69 (1987); *Liberty Mutual Insurance Co. v. Lloyd Schoenheit Truck & Tractor Service, Inc.*, 191 Ill. App. 3d 578, 582, 547 N.E.2d 1272 (1989); *Gramse v. Royal Crest Enterprises, Inc.*, 100 Ill. App. 3d 100, 104, 426 N.E.2d 614 (1981). Indeed, in a case involving application of a workers' compensation lien, the Illinois Supreme Court stated that this section of "[t]he Structural Work Act creates a distinct cause of action in the surviving spouse and/or dependents of a decedent in their individual capacities." *Schrock*, 159 Ill. 2d at 539.

Thus, the plain meaning of the language employed in the statute indicates that any person who was dependent upon the decedent for support may assert a claim under the Act, and such a person is not precluded from doing so merely because a spousal relationship did not exist. If the legislature had intended to create a right of action for only those persons who were married to or were lineal heirs of the decedent, the legislature would have manifested that intent by placing unequivocal language in the statute. The legislature did not do so here. Instead, the legislature adopted terms of broad import, which provided a remedy to an extensive class of persons suffering an injury caused by a willful violation of the Act. This interpretation is consistent with the fundamental goals underlying the Structural Work Act, which include encouraging safe construction practices to prevent injury to employees working in extrahazardous occupations and compensation of those injured as a consequence of willful violations of the Act. See *Harvel*, 146 Ill. 2d at 284, citing *Simmons v. Union Electric Co.*, 104 Ill. 2d 444, 459-60, 473 N.E.2d 946 (1984); *Halberstadt v. Harris Trust & Savings Bank*, 55 Ill. 2d 121, 127, 302

N.E.2d 64 (1973). Moreover, the Illinois Supreme Court has held that the Structural Work Act should be liberally construed to effectuate its protective and compensatory purposes. *Harvel,* 146 Ill. 2d at 284-85, citing *Crafton v. Lester B. Knight & Associates, Inc.,* 46 Ill. 2d 533, 536, 263 N.E.2d 817 (1970).

We conclude, therefore, that if Lisa Williams is able to present evidence that she depended upon the decedent for support, she is entitled to seek recovery under section 9 of the Act. Accordingly, we reverse the trial court's dismissal of Williams' individual claim.

■ Plaintiffs also assert that the trial court erred in admitting evidence of OSHA standards for improper purposes which exceeded the limited purpose of establishing the standard of care. Specifically, plaintiffs contend the trial court improperly allowed defense counsel to elicit testimony that OSHA standards govern only employers and that a party who merely owns the property on which the injury occurred cannot be held liable for violations of OSHA standards. In support of this contention, plaintiffs rely principally upon the decisions in *Pozzi v. McGee Associates, Inc.,* 236 Ill. App. 3d 390, 602 N.E.2d 1302 (1992), and *Ryan v. Mobil Oil Corp.,* 157 Ill. App. 3d 1069, 510 N.E.2d 1162 (1984). These cases held that it was proper to admit evidence of OSHA provisions to establish the standard of care, but to exclude testimony regarding the applicability of OSHA regulations to a nonemployer. However, we find the decisions in *Pozzi* and *Ryan* distinguishable because they are premised upon facts that are not present here. In both cases, the construction contract, which defined the duties of the defendant, specifically provided that the work was to be performed in accordance with OSHA regulations. Thus, the defendants in *Pozzi* and *Ryan* were contractually bound to observe OSHA standards, and compliance with those regulations constituted an integral element of the duty of care owed by the defendant to the injured worker.

In the case at bar, defendant Lake Forest was not a party to the construction contract or subcontracts and was not the decedent's employer. Consequently, Lake Forest had no obligation to ensure that the sewer extension project would be performed in accordance with OSHA regulations. As a result, the trial court acted correctly in admitting testimony that the OSHA standards did not apply to Lake Forest. *Foster v. Devilbiss Co.,* 174 Ill. App. 3d 359, 366, 529 N.E.2d 581 (1988); *Hall v. Archer-Daniels-Midland Co.,* 142 Ill. App. 3d 200, 214-15, 491 N.E.2d 879 (1986).

Plaintiffs next claim that the trial court erred in instructing the jury.

■ The general rule is that the court must instruct the jury on

all issues reasonably presented by the evidence. *Lounsbury v. Yorro*, 124 Ill. App. 3d 745, 464 N.E.2d 866 (1984). Each party is entitled to have the jury properly instructed on his theory of the case, and the failure to do so may warrant a new trial. *Willhite v. Goodman*, 64 Ill. App. 3d 273, 275, 381 N.E.2d 68 (1978). The trial court is obligated to determine what instructions should be tendered to the jury, and its decision will not be disturbed absent an abuse of discretion. *Lundquist v. Nickels*, 238 Ill. App. 3d 410, 431, 605 N.E.2d 1373 (1992). An instruction will be deemed to have been properly given where it is supported by some evidence in the record. *Yates v. Chicago National League Ball Club, Inc.*, 230 Ill. App. 3d 472, 487, 595 N.E.2d 570 (1992).

█ Plaintiffs contend that the trial court committed reversible error by giving a non-Illinois Pattern Jury Instruction regarding sole proximate cause.

The trial court issued the following proximate cause instruction:

"More than one person may be to blame for causing an injury. If you decide that the plaintiffs have proved all of the propositions of their case, then it is not a defense that something other than a violation of the Structural Work Act by the defendant may also have been a cause of the death, or that some third person who is not a party to the suit or decedent's employer may also have been to blame.

However, if you decide that the sole proximate cause of the death of the decedent was something other than a violation of the Structural Work Act by the defendant, then your verdict should be for the defendant."

This instruction combined the language contained in pattern jury instructions numbered 180.18 and 180.19 (Illinois Pattern Jury Instructions, Civil, Nos. 180.18, 180.19 (3d ed. 1990) (IPI Civil 3d)), in accordance with the practice notes that accompany those instructions (IPI Civil 3d Nos. 180.18, 180.19, Notes on Use). The practice notes specifically state that such an instruction should be used where there is evidence that the sole proximate cause of the death may have been the conduct of persons other than the defendant or a condition for which the defendant was not responsible, or where misconduct by the decedent's employer or by a person who is not a party to the suit may have contributed to cause the occurrence. IPI Civil 3d Nos. 180.18, 180.19, Notes on Use.

The giving of such an instruction was approved in *Roedner v. Central Illinois Public Service Co.*, 117 Ill. App. 3d 81, 86-87, 452 N.E.2d 842 (1983), in *Kreke v. Caldwell Engineering Co.*, 105 Ill. App. 3d 213, 227, 433 N.E.2d 1337 (1982), and in *Zuelsdorf v. Montgomery Ward & Co.*, 64 Ill. App. 3d 408, 414, 380 N.E.2d 1130 (1978).

In the case at bar, the City of Lake Forest presented evidence that it was not in charge of the sewer extension project, and the jury heard ample evidence regarding the conduct and relationships of Caps Construction and Davidson Sewerage & Drainage. Consequently, the defense of sole proximate cause was properly before the jury, and the trial court acted correctly in tendering the above instruction on sole proximate cause.

Plaintiffs also cite numerous allegations of improper conduct by defense counsel and other trial errors in support of their assertion that they did not receive a fair trial. In light of our decision that a remand is necessary, we need not address these claims.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed, and the cause is remanded for further proceedings consistent with the views expressed herein.

Reversed and remanded.

McNAMARA and RAKOWSKI, JJ., concur.